# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| INDIAN HARBOR INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 629 |
| vs. | ) ) | Judge Joan H. Lefkow |
| RANDOLPH PARTNERS, LLC - 740 SERIES, and GIORDANO's ENTERPRISES, INC., | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Indian Harbor Insurance Company ("Indian Harbor") filed suit against Randolph Partners, LLC-740 Series ("Randolph Partners") and Giordano's Enterprises, Inc. ("Giordano's) (collectively, "defendants").[1] Count I seeks rescission of the parties' 2006-2007 insurance contract based on alleged misrepresentations of fact by defendants that were material to Indian Harbor's decision to enter the contract. Alternatively, counts II and III seek a declaratory judgment that Indian Harbor has no obligations to defendants for losses arising from a December 30, 2006 incident caused by a burst sprinkler head because defendants breached the insurance contract or alternatively because the damages were caused by an excluded cause of loss. Defendants counterclaimed, alleging that coverage is warranted, that Indian Harbor breached the insurance contract in denying their claim, that Indian Harbor has engaged in unfair settlement practices, and that the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill.

---

[1] The court has jurisdiction pursuant to 28 U.S.C. § 1332.

Comp. Stat. 505/2, was violated. Before the court are the parties' cross-motions for partial summary judgment. Indian Harbor seeks summary judgment as to Count II of its second amended complaint, while defendants seek summary judgment generally on Indian Harbor's liability. For the following reasons, Indian Harbor's motion [#122] is granted, and defendants' motion [#117] is denied.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND

Randolph Partners owns, manages, and develops commercial property, including a

building at 740 N. Rush Street in Chicago, Illinois. The building has two sections, one with four stories and the other with seven. Giordano's leases the first floor of the building, where it operates a restaurant. During the relevant time period, the only other tenant of the building was On Airr Productions, which occupied the second floor. John Apostolou is the president of both Giordano's and Randolph Partners, and has an ownership interest in On Airr Productions.

**I.      The Insurance Policy**

    **A.      Background**

During the relevant time period, defendants obtained their insurance policies through Tom Maniotis of the Maniotis Insurance Agency. Maniotis requested quotes from the Jack Nebel Companies, who received quotes for policies from Indian Harbor. Defendants authorized Maniotis to bind coverage pursuant to the quotes.

Some of the applications contained representations that the property had a central station alarm. The quote and binder for defendants' 2004-2005 policy contain warranties reading "100% sprinklered. Central station alarm." Exs. 8–9 to Ex. F to Def.'s Mot. This same phrase is contained in the protective safeguards endorsement and location schedule of that policy. Ex. 10 to Ex. F to Def.'s Mot. The quote and binder for defendants' 2005-2006 policy warrant "100% sprinklered. C/S alarms." Exs. 11–12 to Ex. F to Def.'s Mot. The protective safeguard endorsement for that year's policy states "100% sprinklered. Central station b&f alarms." Ex. 13 to Ex. F to Def.'s Mot. The 2006 quote for insurance and the subsequent binder contain the warranty "100% sprinklered, central station burglar and fire alarm." Exs. 14–15 to Ex. F to Def.'s Mot. Maniotis testified that the representations in the quotes and binders for these policies meant that the property had a central station alarm and a sprinkler system for the entire

3

building. None of the quotes or binders was signed by defendants.

### B. 2006-2007 Insurance Policy

Indian Harbor issued defendants an insurance policy for the 740 N. Rush property effective from January 30, 2006 to January 30, 2007. This policy was a renewal of prior policies for the same property. The policy had a $5,000 deductible. Indian Harbor agreed to pay for "direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss." Ex. A to Second Am. Compl. at 5, hereinafter "Policy No. FCI 003 3007." Loss or damage caused by sprinkler leakage was covered. *Id.* at 20. The policy excluded from coverage damage caused by or resulting from, among other things, "wear and tear," "rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself," and "faulty, inadequate or defective . . . maintenance of part or all of any property on or off the described premises." *Id.* at 20, 22. In the event of loss, defendants were required to:

> (2) Give [Indian Harbor] prompt notice of the loss or damage, including a description of the property involved.
> (3) As soon as possible, give [Indian Harbor] a description of how, when and where the loss or damage occurred.
> (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of [the] expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. . . . Also, if feasible, set the damaged property aside and in the best possible order for examination.
> . . . .
> (6) As often as may be reasonably required, permit [Indian Harbor] to inspect the property proving the loss or damage and examine [the] books and records. Also permit [Indian Harbor] to take samples of damaged and undamaged property for inspection, testing and analysis . . . .
> . . . .
> (8) Cooperate with [Indian Harbor] in the investigation or settlement of the claim.

*Id.* at 13–14. The policy contained a protective safeguard endorsement. The endorsement

4

provided that defendants were required to maintain certain protective devices or services as a condition of insurance. The condition listed was "100% sprinklered. C/S b&f alarms." *Id.* at 38. The associated symbol was P-9, identified as "[t]he protective system described in the Schedule." *Id.* A location schedule that was part of the policy includes a line reading "100% sprinklered. Central station alarm." *Id.* at 40.

## II. The Underlying Incident

In the early morning hours of December 30, 2006, a Giordano's employee noticed water running down from the fourth floor of the property to the first floor lobby. The water was caused by a sprinkler head that had begun spraying water on the fourth floor. Around 2:00 a.m., a Giordano's manager called the property's maintenance man, Frank Turek, at his home in Lake Station, Indiana to inform him of the problem. Turek told the manager to call a plumber, but the manager was apparently unable to find one. Turek arrived at the property around 3:30 a.m. When he went to the fourth floor, he observed water "gushing out of the sprinkler system." Ex. A to Pl.'s Mot. for Partial Summ. J. at 63–64. Turek then shut off the water. The sprinkler head had broken off the ceiling by the time Turek arrived, and he did not look for the broken sprinkler head.

After the water was turned off, Turek called Rosie Lambrinatos, who worked for defendants. Turek considered Lambrinatos to be his boss. At the time of the incident, Apostolou, under whom Lambrinatos directly worked, was out of town and had put Lambrinatos in charge of overseeing the property. After being told that the fire department had not been called but that the water had been shut off, Lambrinatos testified that she instructed Turek to

5

clean up the water and leave Apostolou alone.[2] Lambrinatos's husband, Spiro, who is a partner in On Airr Productions, then went to the property, where he filmed the damage with Turek.

### III. Building Repairs

The day of the incident, Systems Piping, Inc. replaced seven sprinkler heads on the fourth floor, including the one that had broken off the ceiling. Turek testified that he thought the replaced sprinkler heads were disposed of by Systems Piping and that he did not know whether Systems Piping had recovered the broken sprinkler head.

Carpet replacement began on January 5, 2007. This job was undertaken by Lambrinatos's brother-in-law, Jerry Lambrinatos. The total cost of the carpet replacement was $44,227.56, and $13,725 of this amount was paid in January and February.

Lagis Construction LLC performed work as early as February 20, 2007 on the property. A March 8, 2007 invoice of $117,067.89 showed charges for eighteen days of removing, rewiring, and replacing 145 electric fixtures, fifteen days of cleaning and disposing of debris, and seven days of removing and replacing damaged tiles and grid, among other things.

Champion Drywall, Inc. performed drywall work from February 21, 2007 to February 27, 2007. Defendants paid Champion Drywall $13,244, including overtime for work performed on February 27, 2007.

### IV. The Claim

Allen Aynessazian, Randolph Partners' senior vice president and chief operating officer, testified that at the time the incident occurred, it was Lambrinatos's responsibility to make sure

---

[2] Turek testified that Lambrinatos did not instruct him not to call Apostolou. He also testified that he would not have done so regardless.

that the loss was reported to the insurance company. Lambrinatos appears not to have informed Apostolou or any other of defendants' officers of the December 30, 2006 incident until February 2007. She did admit to having told Aaron Uftring, an accountant for Giordano's, to pay any bills that came in related to replacement carpeting and other expenses prior to this time, but it is not clear whether Uftring was aware of the underlying incident. In mid- to late-February 2007, Lambrinatos told Apostolou about the incident and that the damage appeared to be more than she originally estimated. Apostolou told Lambrinatos that it might not be worth making a claim depending on the amount of damages since the deductible under the insurance policy was high.[3] Lambrinatos then obtained a copy of the insurance policy from Steve Baldasti, Giordano's controller, and learned that defendants had a $5,000 deductible. After informing Apostolou, Lambrinatos told Baldasti to make a claim for the damage caused by the incident.

Baldasti notified defendants' insurance agent, Maniotis, of the December 30, 2006 incident on February 27, 2007 and requested that Maniotis inform Indian Harbor of the loss. Maniotis then submitted a property loss notice to Indian Harbor on February 28, 2007. In August 2007, Randolph Partners submitted a sworn statement in proof of loss to Indian Harbor, citing a "bursted sprinkler head" as the cause of loss and claiming $809,009.63 in damages. This amount included, among other things, the payments made to Jerry Lambrinatos, Lagis

---

[3] Lambrinatos testified that Apostolou told her not to make a claim since the deductible was high and claimed that Apostolou told her the deductible was $50,000. Apostolou testified that he told Lambrinatos to make a claim if doing so was worth it and that he did not know exactly what the deductible was.

    Aynessazian testified that defendants generally only made a claim once they had determined their damages so as to ensure that they did not submit frivolous claims. He stated that this process often takes some time. Aynessazian was not involved in the decision to make a claim for the December 30, 2006 incident. He did testify in his deposition, however, that, if he were making the decision, he would have given notice on February 20, when it was determined that sucking water out of the carpets had not resolved the issues caused by the incident.

Construction LLC, and Champion Drywall, Inc. detailed above.

Indian Harbor's investigation revealed that there was no central station fire or burglar alarm for the entire building, although a central station burglar alarm existed for the first floor space used by Giordano's. Indian Harbor denied coverage for the incident on January 29, 2008. It based this denial on several grounds. First, Indian Harbor concluded that defendants had misrepresented material facts during the application period for their initial Indian Harbor insurance policy by stating that the property's sprinkler system was in compliance with standards set forth in the policy when in reality the sprinkler system did not meet these requirements. This, Indian Harbor maintained, made the 2006-2007 insurance policy void. Alternatively, Indian Harbor denied defendants' claim based on their failure to maintain the sprinkler system as required by the policy, to provide a central station alarm, to protect the property from additional damage by failing to notify the Chicago Fire Department or other appropriate local parties to shut off the water flow, to promptly notify Indian Harbor of the incident, and to set aside the burst sprinkler head. Indian Harbor also concluded that the cause of loss was not covered by the insurance policy.

## DISCUSSION

Both parties have moved for summary judgment on Indian Harbor's liability to cover the loss caused by the December 30, 2006 incident. Their arguments center on three issues: (1) whether defendants provided Indian Harbor with "prompt notice," (2) whether defendants breached the condition that damaged property be set aside if feasible, and (3) whether defendants failed to comply with the protective safeguards endorsement. The parties agree that if defendants failed to meet one of these conditions, Indian Harbor is not required to provide

coverage but dispute whether the conditions were met.

The protective safeguards endorsement provides that "[a]s a condition of this insurance, [defendants] are required to maintain the protective devices or services listed in the Schedule above." Policy No. FCI 003 3007 at 38. Symbols are assigned to various protective safeguards listed on the endorsement. The applicable symbol for the insurance policy was P-9, "[t]he protective system described in the Schedule." *Id.* The schedules states "100% sprinklered. C/S b&f alarms." *Id.* Indian Harbor maintains that "C/S b&f alarms" means central station burglar and fire alarm. Defendants argue that the meaning of the term is "anything but obvious," Def.'s Resp. to Pl.'s Mot. for Summ. J. at 9, and, in fact, cannot mean central station fire alarm because there is a symbol specifically designated for such a system. The latter argument can be easily discarded, however, as there is also a symbol for automatic sprinkler system yet defendants do not argue that the term "100% sprinklered" does not mean that an automatic sprinkler system had to be present throughout the building.

Language in a contract is ambiguous if it is "reasonably susceptible to more than one meaning." *Curia* v. *Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (citation omitted) (internal quotation marks omitted). While defendants contend that it is unclear what "C/S b&f alarms" means from the policy, they do not present any alternative reasonable interpretation to that given by Indian Harbor. Instead, they just maintain that Indian Harbor's interpretation is incorrect. Such speculation by defendants does not suffice to create an ambiguity. The court is left to conclude that, when considered in light of the policy as a whole and particularly the location schedule that contains the similar statement "100% sprinklered. Central station alarm," Policy No. FCI 003 3007 at 40, defendants were required to maintain a central station burglar and fire

9

alarm as a condition of coverage.[4]

Although defendants now argue that even if the term does mean "central station burglar and fire alarm," they complied with this requirement as there was a central station burglar and fire alarm for the first floor restaurant.[5] This, however, is not accurate, as defendants themselves admitted that there was not a central station fire alarm for any part of the building during the period in which the insurance policy was in effect, including on December 30, 2006. Further, Chuck Mishoulan, the president of Alert Protective Services, the company that provided alarm monitoring for the Giordano's restaurant at 740 N. Rush, testified that his company only provided monitoring for a burglar alarm on the first floor and did not have a contract with Giordano's to monitor a fire alarm. Even if defendants' argument that the protective safeguard endorsement did not require a central station burglar and fire alarm covering the entire building were accepted, they still would not have been in compliance as Giordano's did not have a central station fire alarm. Thus, Indian Harbor was warranted in denying defendants' claim for the damage caused by the December 30, 2006 incident. *See Goldstein* v. *Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 754 (failure to comply with protective safeguard endorsement precluded coverage); *Wabash Props., Inc.* v. *Transport Indem. Co.*, No. 84 C 7641, 1985 WL 2452, at *3–4 (N.D. Ill. Aug. 21, 1985) ("If [the insured] breached the automatic sprinkler condition, then, coverage under the policy was suspended during the breach whether or not the

---

[4] Even were the court to conclude that the language is ambiguous, the extrinsic evidence presented supports Indian Harbor's interpretation, as previous policies, quotes, and binders contain variations on this term, with some, including the quote and binder for the 2006-2007 policy, explicitly referring to a "central station burglar and fire alarm."

[5] Defendants admit that if a central station fire alarm had existed on the day of the incident, the alarm would have been set off and a monitoring company notified.

failure of the sprinkler caused the loss."). Summary judgment will be granted in Indian Harbor's favor on Count II of its complaint.[6]

## CONCLUSION AND ORDER

For the foregoing reasons, Indian Harbor's motion [#122] is granted, and defendants' motion [#117] is denied. Judgment is entered in favor of Indian Harbor as to Count II of the second amended complaint.

Dated: August 10, 2010          Enter: _____

                                                                JOAN HUMPHREY LEFKOW
                                                 United States District Judge

---

[6] Because the court concludes that defendants failed to comply with the protective safeguard endorsement, it need not consider the parties' other arguments related to coverage or Indian Harbor's claim for rescission.